# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-3685

_____

Betty Johnson,                               *
                                             *
    Plaintiff - Appellant,           *
                                             *
                                             *  Appeal from the United States
v.                                           *  District Court for the
                                             *  Eastern District of Arkansas.
Michael J. Astrue, Commissioner of           *
Social Security,                             *
                                             *
    Defendant - Appellee.            *

_____

Submitted:  September 22, 2010
Filed:  January 6, 2011

_____

Before LOKEN, HANSEN, and BENTON, Circuit Judges.

_____

LOKEN, Circuit Judge.

Following denial of a previous application, Betty Jean Johnson applied for disability benefits and supplemental security income under the Social Security Act, alleging a disability onset date of December 1, 2005. See 42 U.S.C. §§ 423, 1382. After an August 2007 administrative hearing, the Commissioner's administrative law judge (ALJ) denied the applications, finding that Johnson has severe impairments but retains the residual functional capacity to perform her past relevant work as a cashier. Johnson filed this action seeking judicial review of the agency's adverse final action.

The district court[1] affirmed, concluding that substantial evidence on the administrative record as a whole supports the ALJ's decision.

Johnson appeals, arguing that the ALJ erred in discounting a June 2007 Medical Source Statement (MSS) completed by Dr. Dennis Yelvington (one of her numerous treating physicians) and Johnson's complaints of disabling pain and fatigue at the hearing. Like the district court, we must review the entire administrative record to "determine whether the ALJ's findings are supported by substantial evidence on the record as a whole. We may not reverse . . . merely because substantial evidence would support a contrary outcome." Dolph v. Barnhart, 308 F.3d 876, 877 (8th Cir. 2002). Substantial evidence is that which a "reasonable mind might accept as adequate to support a conclusion." Brown v. Astrue, 611 F.3d 941, 951 (8th Cir. 2010) (citation omitted). Applying that standard here, we affirm.

## I. Dr. Yelvington's Medical Source Statement

Betty Johnson, thirty-two years old when she filed these applications, was fired from her last job as a cashier in February 2004 due to an unexcused absence from work. The following month, she was hospitalized for a fever of unknown origin that was resolved. On April 1, 2004, after extensive lab tests, Dr. Ricardo Zuniga at the University of Arkansas for Medical Sciences diagnosed Johnson with an early form of systemic lupus erythematosus (SLE or lupus). Although Johnson has also been aggressively treated and occasionally hospitalized for severe hypertension (high blood pressure), the ALJ found that her hypertension "is well controlled when she takes her medication." This finding was well-supported by extensive medical records for the period following the alleged onset date, and Johnson submitted no evidence that

---

[1]The Honorable Beth Deere, United States Magistrate Judge for the Eastern District of Arkansas, sitting by consent of the parties pursuant to 28 U.S.C. § 636(c).

hypertension rendered her unable to work. Thus, this case is about lupus, as the ALJ and the district court recognized.

SLE causes a person's immune system to attack and injure the body's own organs and tissues. Its cause is unknown, and diagnosis can be difficult. Symptoms vary greatly and may include: joint pain including arthritis, skin rashes, coughing and shortness of breath, fever, fatigue, weight loss, nausea and vomiting, headaches and confused thinking, kidney malfunction, and pericarditis (inflammation of the tissue surrounding the heart). "Almost every system of the body can be affected." The severity of lupus fluctuates over time, with "periods with mild or no symptoms, followed by a flare [during which] symptoms increase in severity and new organ systems may become affected." 4 The Gale Encyclopedia of Medicine 3616-17 (3d ed. 2006); see Gude v. Sullivan, 956 F.2d 791, 792 (8th Cir. 1992). Lupus with a defined level of severity and of impact on daily living is a listed impairment. 20 C.F.R. Pt. 404, Subpt. P, App. 1, Pt. A, § 14.02. A listed impairment requires no further proof to establish that the claimant is disabled. See 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). Johnson does not argue that her lupus meets the criteria of a listed impairment.

Dr. Zuniga's April 2004 report stated that Johnson "reports that she has no symptoms at this time." Dr. Zuniga's team found "no evidence of internal organ involvement" and prescribed Plaquenil (hydroxychloroquine) to treat her early form of lupus. Dr. Zuniga saw Johnson again in July 2004 and reported: "The patient states that she is doing well [and] reports no new symptoms at this time." "There is no evidence of active SLE at this time, and she is tolerating well the medications." In October 2004, Dr. Zuniga saw Johnson and "found no evidence of active lupus in this patient." Dr. James Abraham, a rheumatologist with the Little Rock Diagnostic Clinic, became Johnson's primary treating physician for lupus in August 2005. He reported that Johnson "last saw Dr. Zuniga in January of 2005 and he did not feel that her lupus was active at that time." In his August exam, Dr. Abraham did not "detect

-3-

anything by history or physical exam that would suggest increased activity of her lupus . . . . Unless we find any problems, then I would recommend just continuing with the Plaquenil."

Johnson was hospitalized with pericarditis in November 2005. Attending physician Randal Hundley consulted with Dr. Abraham and treated Johnson with prednisone, a corticosteroid. She was discharged "in markedly improved condition." Johnson saw Dr. Abraham again in late December 2005, after the alleged disability onset date. He noted that her lupus "is probably doing well at this time" and doubted the disease was active. He reduced her prednisone dosage to minimize side effects such as weakness. Johnson was hospitalized again with sharp chest pain in May 2006. Dr. Hundley diagnosed "pericarditis, likely due to lupus." After consulting Dr. Abraham, Dr. Hundley gave her prednisone resulting in "marked improvement." Dr. Abraham started her on methotrexate while tapering steroid dosages.

Dr. Abraham next saw Johnson in November 2006 after she missed a follow-up appointment. Johnson reported she had stopped taking methotrexate a month ago and chest pain returned. She went to the emergency room and was given a one-week course of prednisone that "made the pain go away." Dr. Abraham reported, "She is having no other complaints today." He restarted her on methotrexate to prevent recurring pericarditis, continued the Plaquenil, and prescribed tramadol[2] for musculoskeletal pain. Dr. Abraham saw Johnson again in January 2007. This report is the last medical record by a treating lupus physician in the administrative record. Dr. Abraham summarized Johnson's current condition:

> 1. SLE with history of recurrent pericarditis. Right now she appears to be stable on Plaquenil and methotrexate. I don't hear or see

---

[2]Tramadol is prescribed for the "management of moderate to moderately severe chronic pain in adults." Physician's Desk Reference 2694 (64th ed. 2010).

anything right now that suggests the need for more aggressive immunosuppressant therapy.

2. Severe hypertension. Her blood pressure looks very good today.
3. Osteopenia/osteoporosis followed by Dr. Yelvington.
4. History of anemia. Her last CBC was essentially normal.

In June 2007, Dr. Yelvington completed the Medical Source Statement (MSS) at issue. This form consists of a series of check marks assessing residual functional capacity, a determination the ALJ must make, which are "conclusory opinions that may be discounted if contradicted by other objective medical evidence in the record." Cain v. Barnhart, 197 F. App'x 531, 533 (8th Cir. 2006) (unpublished), and cases cited. Like the MSS for a lupus patient in Hamilton v. Astrue, 518 F.3d 607, 611 (8th Cir. 2008), Dr. Yelvington checked entries on the form for lifting, carrying, standing, sitting, reaching, manipulation, necessary accommodations at work, environmental restrictions, and likely absences from work that, if accurate, would preclude Johnson from doing "light" work as defined in 20 C.F.R. § 404.1567(b). Because a vocational expert classified Johnson's past relevant work as a cashier as light work at the hearing, crediting Dr. Yelvington's opinion as reflected on the MSS form would undermine the ALJ's finding that Johnson, at the time of the August 2007 hearing, was not disabled because she had the residual functional capacity to perform her past work as a cashier. See 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

The ALJ considered Dr. Yelvington's opinion but found it to be unpersuasive because the medical findings "otherwise documented in the record do not support a finding that the claimant's activity level is this restricted." Although Johnson argues that Dr. Yelvington's opinion should be given "controlling weight" because he was a treating physician, the ALJ's analysis was consistent with the Commissioner's regulations, which provide that a treating physician's opinion is given controlling weight if, and only if, it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2).

-5-

Dr. Yelvington, a family practice physician, treated Johnson for osteoporosis, not for hypertension or for lupus. The record contains no substantive treatment notes by Dr. Yelvington. It does not show whether Dr. Yelvington treated Johnson for any condition after April 2007, the circumstances in which he completed the MSS form in June 2007, or even whether he saw Johnson at that time. In the MSS, Dr. Yelvington cited as supporting medical findings "uncontrolled HTN [hypertension]" -- a finding contradicted by the post-onset-date medical records -- and "Systemic Lupus" including occasional numbness of hands "under the care of Dr. James Abraham." But the above-summarized, largely positive reports by two physicians who treated Johnson for lupus, and the reports by Dr. Hundley, who twice successfully treated her for pericarditis, do not begin to support the extremely limited functional capacities and severe workplace and environmental restrictions checked by Dr. Yelvington on the June 2007 MSS, which he completed on the eve of the administrative hearing.[3]

Johnson objects that these other treating physicians provided no contrary opinions regarding her ability to work. But they had no occasion to do so; Johnson was unemployed when they treated her. We have often said that "[a] treating doctor's silence on the claimant's work capacity does not constitute substantial evidence supporting [an] ALJ's functional capacity determination when the doctor was not asked to express an opinion on the matter and did not do so, particularly when that doctor did not discharge the claimant from treatment." Pate-Fires v. Astrue, 564 F.3d 935, 943 (8th Cir. 2009), and cases cited. But here, medical records prepared by the most relevant treating physicians are inconsistent with Dr. Yelvington's opinion and provide affirmative medical evidence supporting the ALJ's residual functional capacity findings. See Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001).

---

[3]The regulations provide that the agency "will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability." 20 C.F.R. § 404.1502.

In these circumstances, substantial evidence supports the ALJ's decision to discount Dr. Yelvington's contrary opinion.

## II. Johnson's Subjective Complaints of Disabling Pain

At the August 2007 hearing, Johnson testified that lupus makes "my bones ache . . . like they've been twisted," that she was in nearly constant pain and occasionally had trouble breathing, and that she must lie down from exhaustion most every afternoon. On bad days -- "probably half of the month" -- "I can't hardly move [and] I stay in bed a lot." A friend testified that Johnson moved very slowly on bad days, that her energy level had decreased since she became ill, and that she had lost a great deal of weight. The ALJ found that these allegations of disabling pain and discomfort were not credible because Johnson received minimal medical treatment, and her impairments never forced her to quit a job. Johnson argues that the ALJ disbelieved her testimony "for demonstrably false reasons" that constitute reversible error under Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984), which requires an ALJ expressly to consider enumerated factors and to discount a claimant's subjective complaints of pain only "if there are inconsistencies in the evidence as a whole." See also 20 C.F.R. § 404.1529.

We agree the ALJ's opinion did not adequately acknowledge that Johnson's complaints were consistent with the medical authorities that describe and discuss the typical effects of lupus. But the critical question is whether her lupus had progressed to the point at which it would be disabling. On this question, Johnson's testimony was simply not borne out by the medical evidence of record. She frequently reported and was treated with medications for recurring pain, but the treating physicians she saw regularly from 2004 until 2007 consistently reported findings such as "no joint swelling," "no other complaints [other than chest pain]," or "doing well," entries inconsistent with the levels of pain and fatigue she described at the hearing. See Wagner v. Astrue, 499 F.3d 842, 853 (8th Cir. 2007). Although the record would

also have supported a contrary finding, this inconsistency justified the ALJ in discounting Johnson's subjective complaints of *disabling* pain. Johnson clearly suffers from the effects of lupus, and if the disease progresses in severity, as often happens, she will doubtless become disabled. But during the period in question, we agree with the district court that the administrative record as a whole provided substantial evidence to support the ALJ's finding that Johnson retained the residual functional capacity to perform her past relevant work and therefore was not disabled.

The judgment of the district court is affirmed.

_____